And turn now to 22-1096 Monarch Casino & Resort, Inc. v. Affiliated FM Insurance Company. May it please the Court, Nelson Wanaka on behalf of the Appellant, Monarch Casino. There are four very important words that separate this case from Sagome v. Cincinnati Insurance Company, and those are physical loss or damage of the type insured by the policy. Essentially every coverage at issue in this case, including the business interruption coverage and the other one that's civil and military authority, attraction properties, are not tied to physical loss or damage in the abstract. They are tied to physical loss or damage of the type insured by this policy. So that's the first difference. We're not looking at this generally. Insurance contracts can and often do use different language or specific language, and here, Affiliated FM, on more than a dozen occasions, use those two terms together. Physical loss or damage of the type insured by the policy, which leads to the second distinguishing feature of this case, which is unlike in Sagome, this insurance policy contained not one, but two affirmative coverages for the actual presence of a communicable disease at an insured location, coupled with access to those locations being limited, restricted, or prohibited by government order. For the communicable disease, it's a $100,000 limit, and that's already been paid, right? It has already been paid, Your Honor. Okay. But our simple point is you cannot read that additional language out of the business interruption coverage that says of the type insured. Insurance policies do this all the time, whether it's via an endorsement. What do we do with the contamination clause that says you don't recover for viruses? So that's an excellent point, Your Honor. This policy, especially its contamination exclusion, is extraordinarily confusing and ambiguous. On the one hand, you have $350 million of coverage in the aggregate limits. On the other hand, there is this virus exclusion or contamination exclusion that purports to exclude all viruses, COVID-19, communicable diseases. Those are caused by viruses. On the other hand, you've got two coverages granting that back in. Well, isn't that – I mean, that's typical of insurance policies. You read the first paragraph and you think I'm insured against everything, and then it says subject to exclusions. You go through your exclusions, see what is excluded, and then they have exceptions to the exclusions. I mean, you know, this isn't my first rodeo. I've seen a lot of insurance policies, and they all seem to be written like that. Yes and no. I mean, so A, there's no exception here for these two separate coverages. This insurance policy knew exactly how to make exceptions. The very next coverage includes it. For example, for loss of data, you know, loss of electricity. It says these things are excluded except as provided in these additional coverages. That language is not included for the communicable disease coverages, and that has intent just like anything else. More importantly, this policy has decontamination coverage in the amount of $350 million. So it purports to exclude losses caused by contamination, then it has $350 million in decontamination coverage and these other affirmative disease coverages. Our simple point is that reading this policy as a whole, the affirmative disease coverages are not exceptions to the physical loss or damage requirement. Prior to the COVID-19 outbreak, I'm unable to find a single case identifying an exception to an all-risk policies physical loss or damage requirement. That is the structure of these policies. If you look at the Loprino case, there is this broad grant of coverage. There's nothing broader than an all-risk policy either. It says we will insure you for all risks of physical loss or damage. And the notion that somehow these two other coverages are silent exceptions to that. Well, I mean, start with that first statement. It isn't as broad as it could be. It's all risk for physical loss or damage. So if we said this is the same as our prior case and this isn't physical loss or damage, you're out at stage one, right? Our position is that this case is obviously very different because you cannot have a policy that purports to insure against risks of physical loss or damage and has dozens of coverages. And among those are these two items. So saying that these communicable disease coverages are somehow outside of the policies all-risk insuring provision, prior to the COVID-19 outbreak was very unusual and frankly unheard of to say that something can exist in a policy outside of a specific coverage is outside the policies broad insuring agreement without mentioning that it is. Because that language is not there. I reviewed the policies last night and looked at them again this morning. It is not obvious. It is not even really indicated in this policy anywhere that these are exceptions to the policy's physical loss or damage requirement. How are you supposed to read them? What do they mean if they don't mean what your opposing counsel says they mean? I mean, they're meaningless under your analysis. They're not meaningless. They are additional coverages. We give you, I can't remember the amount, $350 million in coverage. And we also give you another $100,000. I mean, that doesn't make much sense, does it? We're not asking for $350 million. No, that's the limits, though. You could be asking for that if that was your damages. No, we're asking, so that is the aggregate limit. There can never be more loss than $350 million. So under no set of circumstances can it be $350 million and $100,000. The business interruption coverage is way less than that aggregate limit. It is $60 million. And our position is that an ordinary person reading this policy, when they see those words a dozen times, it says physical loss or damage of the type insured, could think, I have $60 million, $100,000. And that these provisions, these two communicable disease coverages, modify these other coverages that we have in this policy. I'll give you the $60 million. You can have damages up to $60 million. Does it really make sense that they're going to kick in an extra $100,000 on a policy like this? But, you know, it just modifies. It brings into, you know, that $60 million. It opens it up for these types of circumstances, these types of damages under the policy. That is our position. Another distinguishing feature of this case from Segome v. Cincinnati Insurance is just the nature of the proceedings. You know, we filed a first amended complaint. Important to the court in Segome was that there was just a single allegation, you know, of the presence of the disease that was not supported. We sought leave to amend our complaint. We hired two, you know, important experts to support the notion that this, you know, the virus was there in these casinos. You know, we obtained a document from AFN that said the presence of a person inside a building constitutes the actual presence. And that, you know, we amended our complaint. We attached these reports to include allegations that it couldn't be cleaned away. Because as long as there's a person, you know, when these buildings were shut down, nobody knew anything about COVID. You know, they were shut down to prevent the spread. We knew it was there. We were able to establish, you know, through epidemiological studies that it was there. And that's what sets this case apart, is that we have, we don't have conclusory allegations. We have well-supported logical allegations. Was your business interrupted because the virus was there or because the state regulatory agencies shut you down without any epidemiological evidence of their own that the virus was there? It's both, in our opinion. There's no way, in March of 2020, there was no realistic way. Tests didn't even exist for COVID-19 back then. There was no way for us to, you know, to establish that. As soon as we could, you know, we got into that. But I would, I assert, it's our position that it's both. No, I understand. I'm giving it to you. I assume there, I'm sure it was in there. Yeah, there were thousands of occupants in these buildings. But that's, my question is, is that what shut you down? That it was in there? Or were you shut down just like everybody else? Because the government said you're going to shut down, even though they had no way of proving that you actually had COVID-19 in the building. It's our position it was both, Your Honor. And these coverages as well, you know, don't require even a government order to shut it down. It can be from an officer or director of the company. It's just the two prongs. Actual presence of the disease, coupled by an order limiting, restricting, or prohibiting. It doesn't have to be outright prohibition. It can be limiting as well, or restricting access. It comes with the contamination exclusion, which covers actual or suspected presence of a virus. How can that exist in a policy that also covers? Because they're stacked. I mean, you have, we insure everything. We exclude this. We provide additional insurance for this, which is typically referred to as an exception to an exclusion. I mean, you know, you have to make sense of the provisions. And the way you're reading it, this contamination provision means nothing. I don't think it does mean nothing. I think it means under these circumstances. It means we exclude coverage for contamination, but we'll cover it for $65 million. There's also another line right next to that, you know, within the contamination exclusion that talks about, you know, exceptional language for physical loss or damage. Radioactive. No, before that sentence. You know, for other physical loss or damage is in there. But, you know, in most insurance policies, they say, you know, there's an exception for these things. It is not obvious to an ordinary insured that insurance policies are structured this way, are stacked this way, that, you know, exclusions operate this way and additional coverages are exceptions. That is not the standard in Colorado. I would like to reserve the remaining three minutes of my time unless the court has another question for me right now. Thank you. Thank you, Your Honors. Good morning. This is the court, Scott Johnson, representing Eppley Affiliated FM Insurance Company. This court's ruling in the Sagome case is dispositive of this appeal and requires that the judgment below be affirmed. You know, I think there are some differences in the language here that maybe don't put it on all fours with that case because we have a definition. If, in fact, it was physical loss or damage and you had nothing else and that's all excluded and you had nothing else, I might agree with you. But later in the policy, they define a contamination loss as a physical loss. Are you talking about the communicable disease coverages? Yes. No, they do not define a loss as a physical loss or damage. It is the actual presence of a communicable disease is the triggering event for the two communicable disease coverages. They do not describe communicable disease as a type of physical loss or damage as argued by Monarch. Well, they have two types, right? And one of them has a physical loss component. No, it does not. There are two communicable disease coverages. There's one in the property damage section and there's one in the time element or business interruption section. And neither of them references physical damage. They require as a triggering event the actual presence of a communicable disease. There is no reference at all to physical loss or damage and they're not triggered by physical loss or damage. Again, they're triggered by the actual presence of a communicable disease. Well, the business interruption loss is provided in the business interruption coverage as a direct result of physical loss or damage of the type insured. Correct. The triggering event for business interruption coverage is physical loss or damage. But the presence of a communicable disease is not physical loss or damage as this court found in Sagome. The court ruled in Sagome that COVID-19 does not physically injure or harm property. All of the coverage provisions under which Monarch seeks coverage require physical loss or damage as a triggering event. That is the end of Monarch's case. Well, then you shouldn't have paid the $100,000, right? No. Again, that's not physical loss or damage. That is the actual presence of a communicable disease is the triggering event. It's different than physical loss or damage. It's a much lower threshold. It doesn't require any physical alteration of property. It just requires that the communicable disease be present. And as Judge Carson pointed out, he has no doubt that there was COVID-19 on the premises. And according to their own allegations… Well, don't take my word for it. Pardon me? Don't take my word for it. Well, then I'll refer to the allegations in the complaint because they've attached an expert report that said it was 99% certain that there was the presence of COVID-19 on their property. So mathematically, it certainly was. I guess it's kind of circular because if your policy says, we only cover risks for physical loss or damage, right? And you're saying the presence of COVID-19 is insured under this policy. Then logically, doesn't it have to be a physical loss or damage? It does not. So there is this general coverage grant for risks of physical loss or damage. And then there are additional coverages and coverage extensions that this policy has. And those are coverages that go beyond the initial grant of coverage. And some of those additional coverages and coverage extensions require physical loss or damage, and some do not. The two communicable disease coverages, for example, do not require physical loss or damage. And there are other additional coverages that also do not require physical loss or damage. So it is not correct to say that the only thing that this policy covers is physical loss or damage. If you look at the policy as a whole, again, it has additional coverages and coverage extensions. And you have to read each of those. Some require physical loss or damage. Some, like these communicable disease coverages, do not. Well, I'm looking at the communicable disease, and it has coverage in two instances. One is property damage, and the other is business interruption damage, right? Correct. So that suggests, I mean, one could read that to mean that a communicable disease is equated with property damage. Well, property damage and physical loss or damage are two entirely different concepts. Physical loss or damage is, as this Court found in Sagome, is something that requires a physical alteration of property, something that is remedied by repair or replacement. Property damage is a much broader concept and does not necessarily require property be physically altered. And there are a couple of courts that have interpreted this very same policy, the AFM policy before the Court, and have recognized the differences between property damage on the one hand and physical loss or damage on the other. And the cases are Cordish v. Affiliated FM, 573F sub 3rd, 977 at page 1001. That's cited in both our initial brief and in the supplemental brief. And a second case, and that case, by the way, was affirmed by the Fourth Circuit. And the second case not cited in our brief is AU Health Systems, Inc. v. Affiliated FM, 593F sub 3rd, 1344 at page 1354, footnote 3. So again, those courts have recognized there's a difference between property damage and physical loss or damage. They're two entirely different concepts. Counselor, maybe I can follow up with that then. How do you read the policy? I mean, you're essentially saying, let me see if I understand, that the physical damage in the contamination provision, that is where SOGOME comes in and we just end there. Is that what you're saying? No. You don't even get to the business interruption? No. So the triggering coverage for all of the provisions that Monarch seeks coverage under require, as a triggering event, physical loss or damage. And their claim to physical loss or damage is the presence of COVID-19. And in SOGOME, this court has already ruled that COVID-19 does not physically harm or injure property. It's not physical loss or damage. End of story. You don't have to go any further than that. It's a very simple analysis of the coverage, because that's the threshold for coverage. Is there physical loss or damage? And again, this court has already ruled there is not for COVID-19. So again, though, you're suggesting that we don't even need to get to the communicable disease provisions to talk about property damage. Well, correct, because they're not even part of this motion. They've been settled. They're resolved. The communicable disease coverage is limited to $100,000, and it's been paid. That's not the coverage that is at issue, so there's no reason for the court to look at those provisions. But as an interpretive matter, you're saying we don't have to get to those provisions? Don't we have to make sense of the whole thing? Well, if you want to look at the policy as a whole, for sure you do. But again, the communicable disease coverages do not require physical loss or damage. They require the actual presence of a communicable disease as a triggering event, coupled with the order to close the property or limit access. That's different than physical loss or damage. Is property damage defined in the policy? No, property damage is not defined in the policy. So if I'm reading this, how do I know that when you say you've got a possibility of getting property damage for a communicable disease, that that isn't the same as physical loss or damage? Exactly. And let me explain it this way. Because if you have physical loss or damage to your property, let's say your building burns down or whatever, the policy contains a valuation provision that tells you how you measure that loss. It's the lesser of the cost to repair or replace. Right, and that doesn't really fit with a virus, does it? Correct. But you're saying that you still can recover under that communicable disease provision up to $100,000 for physical damage related to a communicable disease. Not physical damage. If you look at the communicable disease coverage. I'm sorry, property damage due to the communicable disease. Give me an example of property damage caused by a communicable disease. People, you know, you have a riot. People try and get out and they break something. I mean, what is it? No, if you look at the communicable disease property damage coverage, it tells you how you value or measure the loss that's covered. It's the cost to clean up, remove, and dispose of the communicable disease. That is what's covered. Clean up, removal, and disposal of the communicable disease. It's not the repair or replacement that you have for physical loss or damage, which requires, as this Court already ruled in Segone, a physical alteration to property. That is remedied by repair or replacement. Communicable disease is not remedied by repair or replacement. The specific coverage provided is for removal, disposal, or cleaning. That's what is covered. And lastly, let me turn to the contamination exclusion. The District Court below found that the contamination exclusion was clear and unambiguous and precluded coverage for Monarch's claim. And that decision should also be affirmed. That language is clear and unambiguous. It has been held to be clear and unambiguous and to preclude coverage for claims in other COVID-19 actions. We cited in our brief the Out West Restaurant Group v. Affiliated FM case from the Ninth Circuit, applying and upholding the very same exclusion in this policy, in that case. We also cited at pages 39 and 40 of our brief numerous other appellate courts and district court cases that have upheld the same or similar exclusion. And how did Monarch respond to those in this reply brief? With silence. Monarch did not even respond to our arguments regarding the contamination exclusion in its reply. And in our view, they've conceded the point. Did they address the contamination exclusion in their opening brief? They did. Absolutely. But they did not respond to our cases that we cited in our brief in their reply. So based on the dispositive SCOAN case and on the contamination exclusion, we respectfully request that the court affirm the judgment below. And that's all I have unless the court has any additional questions. I do. If you look at the contamination exclusion, it relates to costs. Is that exclusion limited? It is not. If you look at the following language, it excludes contamination and costs, including loss of use of the property. And that's essentially what Monarch is alleging, that they've lost the functional use of their casino properties. But it doesn't say loss. It says the cost of making the property safe or suitable for use or occupancy. Yes. Which wouldn't include, for example, your lost profits from not being able to run the casino. It would include that, of course. How would it include? It's the cost of making it safe or suitable for use. It excludes contamination. I'm going to pull up the exclusion and read it. And we did cite a number of cases in our brief on this very issue, that it includes not only the cost but also the losses associated with the inability to use the property. And those are cited in our appeal brief. Since you're running out of time, is this the language you could be talking about? Any cost due to contamination, including the inability to use or occupy property, or any cost of making property safe or suitable for use or occupancy? Thank you, Judge Carson. That is the language I was looking for. I didn't want you to just be standing there when your time ran out. Appreciate it. Thank you. Thank you.  Let us get the clock set, please. Your Honors, the lack of clarity in this policy that has been discussed today exemplifies why this case is a perfect candidate for certification. There is a very real risk. Regardless of the cases in the nation at large, there is presently, between Colorado's federal and state courts, a complete diversion of results and opinions regarding what this policy language means. So what's the question you want to certify? What we ask for certification for below, which is the issue we briefed below, which is not the issue the district court ruled, which is does the actual presence of COVID-19 constitute physical loss or damage of the type insured by this policy? Or it could even be broader. Does it constitute that at all? That is a hugely important question for Colorado insurers and Colorado state courts. You can substitute COVID-19 and take it out and put in methamphetamine vapors, ammonia vapors, smoke damage. We are already seeing this. Insurance companies coming in and saying smoke isn't tangible. You can't see it sometimes. You can only smell it. Therefore, it's not damage. Colorado's Supreme Court needs the ability to consider this question. And there's a risk that Monarch is going to be caught in no man's land, dead to rights. The Regent case, Regents of CU case, this is a sister company with almost the same policy language. And Judge Langer found ambiguities. He didn't just rule based on Western fire. He found ambiguities in this policy for the same reasons we are arguing here. Even aside from the Regents case, which is still headed to trial in the near future. It will be in front of Colorado's appellate courts. In addition to that, there's the Spectrum case, which involves largely the same issues. We've got two cases working their way through Colorado's appellate courts. And this issue just needs to be decided by those courts so they can have an opportunity to weigh in on it. Concerning counsel's argument that we didn't address something in a reply, reply briefs are optional in this court. We address it in our opening brief. Finally, concerning the period of restoration argument, this policy contains slightly different language. It's called a period of liability. There are two avenues Monarch can choose. It's gross earnings or gross profits. We did not get to make, and that's all admitted if you look at the underlying scheduling order. I believe it's appellant's appendix page 112. They admitted we have the option to choose and that if we elect gross profits, that is calculated. It has nothing to do with the time to repair the physical loss or damage. It starts from physical loss or damage, again, of the type insured by the policy. And it runs for 12 months, which is exactly the same language as the communicable disease business interruption coverage. There is no separate period of liability for the communicable disease business interruption coverage. So we respectfully request that the court reverse the district court's decision below or certify the question to the Colorado Supreme Court. Thank you, Your Honors. Thank you.